# UNITED STATES DISTRICT COURT
for the
Eastern District of California

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| | ) | Case No. **REDACTED** |
| BOGART MERCADO | ) | |
| | ) | 2:24-mj-0121 SCR |
| | ) | |

*Defendant(s)*

FILED
Oct 15, 2024
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **July 25, 2024 (Count One) and August 28, 2024 (Count Two)** in the county of **Sacramento** in the **Eastern** District of **California**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1), (b)(1)(A) | Distribution of 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine (Count One) |
| 21 U.S.C. § 841(a)(1), (b)(1)(A) | Distribution of 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine (Count Two) |

This criminal complaint is based on these facts:

(see attached Affidavit of FBI Special Agent James McColgan)

☒ Continued on the attached sheet.

/s/ James McColgan
*Complainant's signature*

James McColgan, FBI Special Agent
*Printed name and title*

Sworn to me and signed via telephone.

Date: October 9, 2024

*Judge's signature*

City and state: Sacramento, California

Sean C. Riordan, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT,
ARREST WARRANT, AND SEARCH WARRANTS**

I, Federal Bureau of Investigation Special Agent James J. McColgan III, being duly sworn, hereby state:

1. This Affidavit is made in support of an Arrest Warrant and Criminal Complaint charging Bogart MERCADO with the following crimes:

    A.) Distribution of methamphetamine, on or about July 25, 2024, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A); and

    B.) Distribution of methamphetamine, on or about August 28, 2024, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A);

2. This affidavit is also made in support of Search Warrants for the following locations to search for evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846, conspiracy to distribute and possess with intent to distribute controlled substances:

    A.) The property located at **1406 Hopkins Street, Sacramento, California, 95822;** owned by "Javier Gutierrez," Date of Birth: XX/XX/1936.[1] ("**TARGET PROPERTY 1**"), as further described in Attachment A-1;

    B.) The property located at **2083 18th Avenue, Sacramento, California, 95822;** owned by Bertha Mercado, Date of Birth: XX/XX/1940; and "Xavier (Javier) G. Mercado," Date of Birth: XX/XX/1936 ("**TARGET PROPERTY 2**"), as further described in Attachment A-2;

    C.) A black 2018 Honda Accord bearing California license plate 8SJC089, with VIN 1HGCV1F30JA204039, registered to Angelina Gonzalez at 2083 18th Avenue, Sacramento, California, 95822, which has been operated by MERCADO ("**TARGET VEHICLE 1**"), as described in Attachment A-3;

    D.) A black 2021 GMC Yukon Denali bearing California license plate 9MLR804, with VIN 1GKS2DKL2MR413206, registered to Bogart MERCADO at 1406 Hopkins Street, Sacramento, California, 95822, which has been operated by MERCADO ("**TARGET VEHICLE 2**"), as described in Attachment A-4; and

    E.) A black 2022 GMC Sierra 1500, bearing California license plate

---

[1] I have partially redacted dates of birth from this affidavit to protect the personal identifying information of the subjects named herein. I have maintained the full dates of birth in my case file.

1

        93376M3, with VIN 3GTUUDEDXNG558028, registered to: Angelina Gonzalez, 1406 Hopkins Street, Sacramento, California, which has been operated by MERCADO ("**TARGET VEHICLE 3**"), as described in Attachment A-5.

3. I am a Special Agent with the FBI, and I am a "Federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). I have been an FBI Special Agent since February 2022. During my training to become Special Agent, I successfully attended the Basic Field Training Course at the FBI Training Facility, Quantico, Virginia. Since graduating, I have participated in numerous investigations involving a variety of violations of both Title 18 and Title 21 of the United States Code, including drug trafficking investigations. I have been assigned to the FBI's Safe Streets Task Force (SSTF) in Sacramento, California since June 2022.

4. Prior to my appointment to the FBI, I spent approximately 10 years working as a municipal Police Officer in Connecticut, most recently for the City of New Britain, Connecticut. As a Police Officer, I investigated violations of local and state laws ranging from motor vehicle crashes to assaults with deadly weapons, drug overdoses, and homicides. I investigated drug violations, made arrests for drug violations. and responded to numerous citizens in medical distress from drug ingestion. While a Police Officer, I performed additional duties as a Field Training Officer, SWAT Operator, SWAT Team Medic, SWAT Firearms Instructor, Drug Recognition Expert, Emergency Medicine Instructor, and Impaired Driving Instructor.

5. During my career as a law enforcement officer, I have been involved as a lead investigator, assisting investigator and/or affiant on search warrants in drug investigations involving marijuana, methamphetamine, heroin, cocaine, fentanyl, psilocybin mushrooms, and prescription drugs. This includes investigations for drug transportation, possession with intent to distribute, distribution, manufacturing, possession for personal use, and personal use. Through those investigations, I have interviewed controlled substance users, sellers, transporters, and manufacturers regarding their various methods of using, packaging, transporting, selling, concealing, manufacturing, and cutting drugs. I have been involved in various types of electronic surveillance, including the consensual monitoring of telephone calls, federal wiretaps, data from "pings," and data from tracking devices. I have discussed aspects of drug trafficking with other law enforcement agents and experts who have knowledge of the distribution and transportation of drugs, the laundering and concealing of proceeds from drug trafficking, and the criminal gangs who participate in these illegal activities.

6. As detailed below, I believe there is probable cause that MERCADO distributed methamphetamine and heroin within the Eastern District of California.

## PROBABLE CAUSE

### Summary of Probable Cause

7. Based on the facts summarized below, I believe Bogart MERCADO engaged in a conspiracy to distribute and possess with intent to distribute controlled substances in the Eastern District of California, and that he distributed controlled substances to an undercover officer on two occasions.

8. In October 2017, MERCADO was convicted of drug and firearms-related offenses in Sacramento County Superior Court. MERCADO was sentenced to 236 months in the California Department of Corrections and Rehabilitation ("CDCR"). MERCADO was released from CDCR in October 2023 and placed on Post Release Community Supervision (PRCS), where he is supervised by the Sacramento County Probation Department. MERCADO provided 1406 Hopkins Street, Sacramento, California, 95822 (**TARGET PROPERTY 1**) as his address for his PRCS Post-Release Packet Checklist residence plan.

9. In October 2023, the FBI began investigating Bogart MERCADO for suspected drug trafficking, with assistance from DEA and other federal, state, and local agencies. In July and August 2024, FBI used an undercover officer to purchase methamphetamine from MERCADO. During the August controlled purchase, MERCADO and Angelina Gonzalez traveled together to the deal, and there is probable cause to believe that MERCADO travelled to **TARGET PROPERTY 2** in order to obtain more controlled substances (to wit, heroin) to sell to the UC.

### July 2024 Controlled Purchase: MERCADO Sells 15 Pounds of Methamphetamine to the FBI.

10. In July 2024, law enforcement successfully introduced a Drug Enforcement Administration (DEA) Undercover Officer (UC) into the investigation. At the direction of law enforcement, the UC placed a recorded call to MERCADO to arrange for a purchase of fifteen pounds methamphetamine from MERCADO for $12,000. The UC and MERCADO agreed to the controlled purchase and to meet at a public parking lot in Sacramento, California.

11. Prior to the operation, the UC and their vehicle were searched for contraband by law enforcement which produced negative results. The UC was under constant surveillance by law enforcement during the operation and communicated with MERCADO prior to the controlled purchase.

12. Immediately prior to the controlled purchase, law enforcement, via aerial surveillance, observed MERCADO depart **TARGET PROPERTY 1** driving a black 2018 Honda Accord bearing California license plate 8SJC089 (**TARGET**

   **VEHICLE 1**), which he drove to the agreed-upon meeting location. MERCADO met with the UC and exchanged the suspected methamphetamine, which was concealed in a carboard box, in exchange for $12,000.

13. After the exchange, the UC and MERCADO departed the meeting location. Law enforcement observed MERCADO depart the area and drive **TARGET VEHICLE 1** in a manner consistent with conducting countersurveillance in order to determine if he was being followed. For example, MERCADO made irregular countersurveillance maneuvers with **TARGET VEHICLE 1**, including abruptly pulling to the side of the road, stopping in the middle of the road, and varying speeds without cause; all these maneuvers led surveilling law enforcement officers to believe that MERCADO was attempting to detect anyone who might be following him.[2] I know through my law enforcement training and experience that these tactics are commonly utilized by drug traffickers who are paranoid about law enforcement detecting their illegal activities. After approximately 10 minutes of countersurveillance maneuvers, MERCADO immediately drove **TARGET VEHICLE 1** back to **TARGET PROPERTY 1**.

14. The UC met with case agents and turned over the suspected methamphetamine. The UC and his/her vehicle were again searched for contraband, and none was found. The suspected methamphetamine was tested by the DEA Western Laboratory and was identified as methamphetamine with a substance purity of 99% (+/- 7%).

    **August 2024 Controlled Purchase: MERCADO Sells Approximately 20 Pounds of Methamphetamine and One Kilogram of Suspected Heroin to the FBI.**

15. In August 2024, the UC texted with MERCADO to set up another drug buy. At the direction of law enforcement, the UC arranged to buy twenty pounds of methamphetamine from MERCADO for $15,000. On or about August 27, 2024, the UC sent a text message to MERCADO indicating the UC would be ready to purchase drugs from MERCADO the next day.

16. On or about August 28, 2024, the UC and MERCADO agreed to meet at a public restaurant parking lot in Sacramento, California. Prior to the operation, the UC and his/her vehicle were searched for contraband by law enforcement which produced negative results. The UC was under constant surveillance by law enforcement during the operation and communicated with MERCADO prior to the controlled purchase.

---

[2] Redacted

17. Immediately prior to the controlled purchase, law enforcement observed MERCADO and his wife, Angelina Gonzalez, depart **TARGET PROPERTY 1** and drive in tandem to the agreed location. Gonzalez was observed driving directly behind MERCADO, as if acting as a follow car.  Upon arrival to the location, Gonzalez and MERCADO parked in direct proximity to each other and Gonzalez appeared to be acting as a look out. MERCADO was driving **TARGET VEHICLE 1** and GONZALEZ was driving **TARGET VEHICLE 2.** MERCADO and the UC exchanged the suspected methamphetamine, concealed in a turquoise duffle bag for $15,000.

18. During the controlled purchase of twenty pounds of methamphetamine, the UC asked MERCADO about additional drugs that MERCADO might have available for sale, specifically heroin, while MERCADO was counting the buy money. MERCADO nodded in the affirmative, the UC then asked for the "ticket" and MERCADO replied 11,5.  I know through my law enforcement training and experience that "ticket" is slang commonly used amongst drug dealers to refer to the price of drugs.  Based on that information, I know through my law enforcement training and experience that MERCADO offered the UC one kilogram of black tar heroin for $11,500.  The UC and MERCADO agreed to reconvene in approximately one hour, so that MERCADO could retrieve the black tar heroin and the UC could retrieve additional money.

19. The UC, MERCADO (driving **TARGET VEHICLE 1**), and GONZALEZ (driving **TARGET VEHICLE 2**) all departed, and the UC turned over the suspected methamphetamine to case agents.  The UC and their vehicle were again searched for contraband, none found.

    After MERCADO sold the UC the methamphetamine and left the meet location, aerial surveillance observed MERCADO and GONZALEZ drive to **TARGET PROPERTY 2**.  MERCADO and GONZALEZ went into **TARGET PROPERTY 2** for approximately ten minutes before returning to their respective vehicles and driving to **TARGET PROPERTY 1**.  After returning to **TARGET PROPERTY 1**, MERCADO texted the UC about meeting for the heroin transaction.  The UC and MERCADO agreed to meet at the same parking lot where they completed the July 25, 2024, controlled purchase.

20. Prior to the operation, law enforcement searched the UC and his/her vehicle for unauthorized contraband and found none.  Law enforcement gave the UC the previously-purchased 20 pounds of methamphetamine in case MERCADO asked to see if the UC was still in possession of the drugs.  The UC was under constant surveillance by law enforcement during the operation and communicated with MERCADO prior to the controlled purchase.

21. Law enforcement observed MERCADO drive **TARGET VEHICLE 2** to the designated location, and exchange suspected black tar heroin with the UC for $11,500.  After completion of the controlled purchase, the UC and MERCADO

5

22. departed the meet location, and MERCADO returned directly to **TARGET PROPERTY 1** without making any stops along the way.

23. The UC met with law enforcement agents and turned over the suspected methamphetamine and heroin to case agents.  The UC and his/her vehicle were again searched for contraband, and none was found. The suspected methamphetamine has been tested by the DEA Western Laboratory and was identified as methamphetamine with a substance purity of 100% (+/- 7%). The heroin has not been tested; however, based on my training and experience and the experience of other drug agents with whom I have worked, the substance appeared consistent in appearance and quality with black tar heroin because it visually resembled black tar heroin and had a tar like consistency when a sample was taken. This substance was tested using a field test and tested presumptively positive for heroin.

*Note: paragraph numbering as shown — item above labeled 22 in source.*

**Additional Surveillance of MERCADO at Requested Search Warrant Locations**

23. On or about September 17, 2024, law enforcement conducted surveillance on MERCADO, during which he was observed operating **TARGET VEHICLE 3**. MERCADO was seen at the vehicle before going into **TARGET PROPERTY 2**.  Law enforcement observed a dark colored SUV arrive at **TARGET PROPERTY 2** and two individuals, one adult male and one adult female, exited the vehicle and entered **TARGET PROPERTY 2**.  Approximately 4 minutes later, law enforcement observed the same adult female that had just arrived return to the SUV and leave the location. Approximately 30 minutes later, the same adult male left the residence and entered a silver sedan parked in front of the residence before leaving the area.  After that, MERCADO was observed walking out of the house, getting into **TARGET VEHICLE 3** and driving away, and returning to **TARGET PROPERTY 1**.

24. On or about September 18, 2024, law enforcement conducted surveillance on MERCADO.  During which, MERCADO parked **TARGET VEHICLE 3** in front of the driveway of 2075 18th Avenue, Sacramento, California, 95822 (hereinafter "2075 18th Avenue"), blocking access to driveway.  2075 18th Avenue has multiple structures on the property, MERCADO was observed by the investigative team moving freely about the property.  MERCADO was observed exiting the rear building of 2075 18th Avenue carrying a blue and white cardboard box and meeting with two unknown Hispanic adult males in the front area of the property.  MERCADO handed the box to one of the males before both males returned to their vehicle and left the area. This appeared indicative of a short stay hand to hand drug transaction, and I know through this investigation that MERCADO previously concealed narcotics in a similar manner by using a carboard box to sell drugs to the UC.  MERCADO was then observed leaving the property, locking the driveway gate, and returning to his vehicle and leaving the area. Additionally, law enforcement observed a man wearing clothing indicative

of a construction worker doing work on 2075 18th Avenue, and the male went back and forth between 2075 18th Avenue and **TARGET PROPERTY 2.**

25. On or about September 23, 2024, law enforcement conducted surveillance on MERCADO. MERCADO was observed to be operating **TARGET VEHICLE 2** and arrived at 2075 18th Avenue.  MERCADO remained at the location before walking to **TARGET PROPERTY 2.**  After approximately 10 minutes, MERCADO returned to **TARGET VEHICLE 2** and drove to **TARGET PROPERTY 1** at which time his juvenile children exited the vehicle and entered the residence.

26. I conducted records checks related to the Target Properties and Target Vehicles and learned the following:

    A.) **TARGET PROPERTY 1** is owned by "Javier Gutierrez," and the SMUD bill is paid by Angelina Gonzalez, who is believed to be MERCADO's wife.  GPS precision location data shows the MERCADO spends hours when someone would reasonably be sleeping in the area of **TARGET PROPERTY 1**. Additionally, **TARGET PROPERTY 1** is MERCADO's listed address for his PRCS.

    B.) **TARGET PROPERTY 2** is owned by "Bertha Mercado and Xavier Mercado," and the SMUD bill is paid by Angelina Gonzalez.  It should be noted, MERCADO's parents are Bertha and Javier Gutierrez Mercado. Additionally, Javier Gutierrez, Xavier G. Mercado and Xavier Mercado are all aliases of Javier Gutierrez Mercado.  I believe MERCADO's father owns both **TARGET PROPERTIES**.

## TRAINING AND EXPERIENCE

27. As a result of my experience and training, I have learned that traffickers who deal in various quantities of controlled substances, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions. Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators. These records may be kept on paper or contained in memory calculators or computers.  It is also my experience that these traffickers tend to keep these accounts and records in their residence and in the areas under their control.  It is my training and experience, that in the case of drug dealers, evidence is likely to be found where the dealers live.  It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time.

28. From my training and experience, I know that individuals involved in drug trafficking frequently store their drugs, drug proceeds, weapons, and other contraband in rooms and areas of their residences that appear to belong to, are

controlled by, and/or are accessible to other occupants, including for example, bedrooms belonging to children, other family members, or roommates, in an effort to conceal the evidence from law enforcement and to disguise their ownership and control of the contraband in the event that it is seized. This warrant therefore seeks permission to search the entire premises of the residence for which the warrant is sought, including any location where there is reasonable cause to believe the items listed in Attachment B may be found. *See Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) ("The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."); *United States v. Ross*, 456 U.S. 798, 820–21 (1982) ("A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found."); *see also United States v. Adjani*, 452 F.3d 1140, 1146 (9th Cir. 2006) ("Although individuals undoubtedly have a high expectation of privacy in the files stored on their personal computers, we have never held that agents may establish probable cause to search only those items owned or possessed by the criminal suspect. The law is to the contrary.") (citing *Zurcher*); *United States v. Tehfe*, 722 F.2d 1114, 1118 (3d Cir. 1983) ("Property owned by a person absolutely innocent of any wrongdoing may nevertheless be searched under a valid warrant.") (cited with approval in *Adjani*).

29. Based upon my experience and training, I have learned that drug traffickers often place their assets in names other than their own to avoid detection of those assets by law enforcement and the Internal Revenue Service (IRS); that those persons are commonly family members, friends, and associates who accept title of assets to avoid discovery and detection; that traffickers also often place assets in the ownership of corporate entities to avoid detection by law enforcement agencies and although these assets are in other individual(s) or corporate names, the traffickers continue to use these assets and exercise dominion and control over them. Typically, traffickers keep records of those registrations and transactions in their residence.

30. I have learned that large-scale drug traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business. It has been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles and other items of value and/or proceeds of drug transactions, including evidence of financial transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances in their residence or in the areas under their control. For example, on July 25, 2024, the FBI paid

      MERCADO $12,000 through the UC, and MERCADO immediately returned directly to TARGET PROPERTY 1.

31. In my experience, traffickers commonly have in their possession, that is, on their person, at their residence and in the areas under their control, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Such firearms are used by drug violators to protect their illicit drug trafficking operations, and themselves against law enforcement and other drug violators because the illicit drug trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug proceeds. Such property may include, but is not limited to, narcotics and other dangerous drugs, jewelry, narcotic paraphernalia, books, records, ledgers and quantities of currency.

32. In my experience, traffickers commonly have in their possession, that is on their person, at their residences, and their vehicles, and in the areas under their control and which they have free and ready access to, drugs, including but not limited to in this case, methamphetamine and heroin, which they intend to distribute. It is my experience that these drug traffickers commonly utilize these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

33. In my experience, drug traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product. Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

34. In my experience, large scale traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver's licenses, employment cards, insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and utilized in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

35. In my experience, drug traffickers often utilize vehicles in which to transport and distribute controlled substances in facilitation of their trafficking activities. It has also been my experience that traffickers will also utilize vehicles as locations in which to store controlled substances prior to distribution. During prior investigations, I have observed that drug traffickers will often utilize vehicles registered in the names of individuals other than themselves in an effort to avoid detection by law enforcement.

36. In addition, these traffickers tend to attempt to legitimize their assets by establishing domestic and foreign businesses, by creating shell corporations, by utilizing bank haven countries and attorneys specializing in drafting and establishing such entities employed to "launder" the proceeds derived from the

distribution of controlled substances.

37. In establishing these entities, the traffickers often must travel to meetings in foreign countries as well as domestically. As a result of that travel, records are generated reflecting travel by commercial and private aircraft, Commercial Ocean, and private vessels as well as common carrier(s).

38. Individuals involved in the distribution of methamphetamine and heroin often make, or cause to be made, pictures, videos, movies, compact discs, floppy discs, or other such items which are or contain photographic or digital images in order to memorialize their methamphetamine and heroin distribution, use, possession, or any other activities surrounding their methamphetamine and heroin and methamphetamine and heroin trafficking activities, and that such items often identify co-conspirators in their methamphetamine and heroin trafficking activities.

39. It has been my experience in the past, and particularly in this case, that when suspects use mobile telephones to communicate with cooperating individuals or undercover agents to set up the methamphetamine and heroin deals, records relating to these activities will be found stored in the cellular telephone. And, as relevant to this case, the drug traffickers in this case have made extensive use of text messaging to communicate about his ongoing drug trafficking. In this investigation, MERCADO used phone numbers 916-500-5645 and 213-800-8589 to communicate with the UC on July 25, 2024 and August 28, 2024 to arrange drug transactions.

40. I know that narcotics traffickers use mobile telephones to communicate with one another, either by voice or text message. Specifically, MERCADO used phone numbers 916-500-5645 and 213-800-8589 to communicate with the UC on July 25, 2024 and August 28, 2024 to arrange drug transactions. Mobile telephones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other narcotics traffickers and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Mobile telephones also contain in their memory a telephone book. This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by a narcotics trafficker is evidence of the associations of the narcotics trafficker, some of which are related to his or her illegal business. Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a narcotics trafficker's mobile telephone can contain evidence of narcotics trafficking because it shows the communications or planned communications of a narcotics trafficker and the telephone numbers of those with whom the narcotics trafficker communicated or intended to communicate. Mobile telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer. Narcotics traffickers sometimes leave voice messages for each other, and this is evidence

both of their mutual association and possibly their joint criminal activity. Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by a narcotics trafficker. Mobile telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a narcotics trafficker who took pictures of evidence of crime. Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

41. As described above and in Attachment A, this Affidavit seeks permission to search and seize things that are related to the ongoing drug distribution activities in whatever form such things are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

42. It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators to whom I have spoken, that the items listed in Attachment B are items most often associated with the distribution of controlled substances, including methamphetamine and heroin, as well as the proceeds from such illegal operations.

43. The facts set forth in this Affidavit are known to me as a result of my personal participation in this investigation, through conversations with other agents and detectives who have participated in this investigation, and from reviewing official reports, documents, and other evidence obtained as a result of this investigation. This Affidavit is not an exhaustive enumeration of the facts that I have learned during the course of this investigation but, instead, are facts that I believe support a finding of probable cause to search the requested locations.

44. Based on my experience and training, and after consulting with other law enforcement officers experienced in drug investigations, I know that individuals involved in drug dealing often maintain at their residences, vehicles, and their persons the items described in Attachment B. Individuals involved in drug dealing also often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances. Therefore, I am requesting authority to seize all the items listed in Attachment B to this Affidavit and incorporated here by reference.

## REQUESTED WARRANTS

45. Based upon this Affidavit, I request that the Court issue an arrest warrant and Criminal Complaint charging MERCADO with the following:

    A.)    Count One: Distribution of methamphetamine, on or about July 25, 2024, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A); and

    B.)    Count Two: Distribution of methamphetamine, on or about August 28, 2024, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A).

46.    Further, I respectfully request that a Search Warrants be issued for the following locations to search for evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846, conspiracy to distribute and possess with intent to distribute controlled substances:

    A.)    The property located at **1406 Hopkins Street, Sacramento, California, 95822;** owned by "Javier Gutierrez," Date of Birth: XX/XX/1936. ("**TARGET PROPERTY 1**"), as further described in Attachment A-1;

    B.)    The property located at **2083 18th Avenue, Sacramento, California, 95822;** owned by Bertha Mercado, Date of Birth: XX/XX/1940; and "Xavier (Javier) G. Mercado," Date of Birth: XX/XX/1936 ("**TARGET PROPERTY 2**"), as further described in Attachment A-2.

    C.)    A black 2018 Honda Accord bearing California license plate 8SJC089, with VIN 1HGCV1F30JA204039, registered to Angelina Gonzalez at 2083 18th Avenue, Sacramento, California, 95822, which has been operated by MERCADO ("**TARGET VEHICLE 1**"), as described in Attachment A-3;

    D.)    A black 2021 GMC Yukon Denali bearing California license plate 9MLR804, with VIN 1GKS2DKL2MR413206, registered to Bogart MERCADO at 1406 Hopkins Street, Sacramento, California, 95822, which has been operated by MERCADO ("**TARGET VEHICLE 2**"), as described in Attachment A-4; and

    E.)    A black 2022 GMC Sierra 1500, bearing California license plate 93376M3, with VIN 3GTUUDEDXNG558028, registered to: Angelina Gonzalez, 1406 Hopkins Street, Sacramento, California, which has been operated by MERCADO ("**TARGET VEHICLE 3**"), as further in Attachment A-5.

## REQUEST TO SEAL

47.    Finally, I respectfully request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant face sheets and sealing order. I believe that sealing these documents is necessary because the items and information to be

seized are relevant to an ongoing investigation into criminal activities by the defendants and their coconspirators. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants over the internet, and disseminate them to other criminals as they deem appropriate, *i.e.*, post them publicly online. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness, as well as endanger the safety of agents serving the warrant requested.

I swear under penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.

  /s/ James J. McColgan III
Special Agent James J. McColgan III
Federal Bureau of Investigation

Sworn to and subscribed before me on the  9th  day of October of 2024.

Hon. Sean C. Riordan
United States Magistrate Judge

Approved as to form:

*/s/ Emily G. Sauvageau*
Emily G. Sauvageau
Matthew De Moura
Assistant U.S. Attorneys

# United States v. Bogart MERCADO
## Penalties for Criminal Complaint

**COUNTS 1 & 2:**

VIOLATION:	21 U.S.C. § 841(a)(1) – Distribution of over 500 grams of a mixture and substance containing a detectable amount of methamphetamine

PENALTIES FOR EACH COUNT:

Mandatory minimum of 10 years in prison and a maximum of up to life in prison; or
Fine of up to $10,000,000; or both fine and imprisonment
Supervised release of at least 5 years up to life.

SPECIAL ASSESSMENT: $100 (mandatory on each count)